IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RORIC GIBBS,

                Plaintiff,

v.

BROOKE LOMAS,

                Defendant.

OPINION AND ORDER

12-cv-789-slc

---

In this civil rights action brought under 42 U.S.C. § 1983, plaintiff Roric Gibbs alleges that defendant Brooke Lomas, a Madison Police Officer, violated his Fourth Amendment right to be free from unreasonable searches and seizures when she arrested him for disorderly conduct and searched his car incident to arrest. Before the court is Officer Lomas's motion for summary judgment. Dkt. 8.

I am denying Lomas's motion. Because the facts known to Lomas at the time were not sufficient to warrant a belief that Gibbs had committed disorderly conduct, I find that Officer Lomas did not have probable cause to arrest Gibbs, rendering her interaction with Gibbs unreasonable under the Fourth Amendment. I also find that Lomas is not entitled to qualified immunity: a reasonable police officer in the same circumstances and with the same knowledge would have understood that probable cause to arrest did not exist for any crime.

Given these rulings, it seems that there are no matters left for trial on the issue of liability, but Gibbs did not file his own motion for summary judgment. I will allow both parties until noon this Friday, September 20, 2013, to report their position on whether any liability issues remain for trial. (I also am pushing back the parties' submission deadlines for trial materials).

From the facts proposed by the parties, I find that the following facts are material and undisputed:

UNDISPUTED FACTS

Plaintiff Roric Gibbs is a 30-year old resident of the State of Wisconsin. Defendant Brooke Lomas is a police officer with the City of Madison Police Department and has been since May 2007.

On July 15, 2012, Katherine and Travis Gruchow were traveling in their car near Olbrich Garden in Madison, Wisconsin when they saw a young man in a red Jeep holding something that looked like a handgun and scratching his temple with it.[1] Both were disturbed by seeing a driver raising a gun. The Gruchows also were concerned because the driver of the Jeep was traveling faster than them. (Although the Jeep was traveling faster than the Gruchows' vehicle, Katherine does not know if her car was actually traveling at the speed limit.) They discussed whether the gun was "real or not and if it was a big deal." Depo. of K. Gruchow, 4/12/13, dkt. 13 at 12, lns. 3-4. Katherine did not see the driver do anything unreasonably loud or boisterous and was not in fear for her safety, she described the conduct as "not normal" and "indecent," and she felt fear for someone's safety, although she could not specify anyone. Katherine did not view the situation as a crime in progress or as a "direct" emergency but as "something that might turn into a concern." Therefore, she and Travis jointly decided to call the police.[2]

---

[1] For ease of reference, I will distinguish between the Gruchows by using their first names.

[2] Neither Officer Lomas nor any other police officer communicated with Travis Gruchow prior to arresting Gibbs, so they were unaware of his internal thought process.

2

Katherine called the non-emergency number for the Madison Police Department–which she had preprogrammed into her cell phone–and told dispatch that they a "saw man driving with a handgun in his car, so we just thought we should report it." Recording of call, dkt. 16. When the dispatch officer asked whether the driver was threatening anyone with the gun, Katherine replied "no, he was driving—we couldn't tell if it [*the gun*] was real or not." *Id.* She stated that he had the gun "up in the air when he was driving, kind of at his side." *Id.* She reported that they then saw the man park his Jeep at Dexter's Pub. (Although the parties' don't propose this fact, Dexter's Pub is about 1½ miles northwest of Olbrich Gardens on city streets). Katherine provided a description of the vehicle and the driver. Katherine volunteered that there was no one in the vehicle and that the driver had walked into the bar. She stated that "uh, that seems a little off" and then chuckled. *Id.* When dispatch asked again if the driver was ever threatening or pointing, Katherine said no but "he was speeding really fast" and they almost lost him a few times. *Id.*

Officer Lomas was on duty in a marked squad car when dispatch advised her of Gruchow's call. In the initial call to Officer Lomas, dispatch reported that the suspect was a white male in a blue shirt with a collar and he arrived at Dexter's Pub in a red Jeep Cherokee. Dispatch told Officer Lomas that the driver "had a gun on him" but "nothing was threatened with the weapon."[3] *Id.* Because Dexter's is located on Officer Lomas's beat, she responded to

---

[3] The parties dispute whether dispatch advised Lomas that the driver was holding up the gun and pointing it at the ceiling of his vehicle. I have listened to the audio recording of the initial dispatch call, and as the parties agree, it did not contain this information. However, as clarified later in the facts, Lomas learned this information from speaking with Katherine Gruchow.

the dispatch by driving to the pub. While en route, Officer Lomas telephonically contacted Katherine Gruchow.

Katherine Gruchow told Officer Lomas that she was a passenger in a vehicle that her husband, Travis, was driving by Olbrich Park. While they were stopped at a red light, Katherine saw the driver of the vehicle in the next lane, a young white male wearing a blue collared shirt, holding a black handgun by his head, pointed at the ceiling. She told Officer Lomas that she again saw the driver hold the gun up and point it at the ceiling of the vehicle while she and her husband followed him in their car as he drove to Dexter's Pub. Katherine stated that he was "driving badly" and accelerated very quickly from a red light. Katherine told Officer Lomas that it did not look like the driver was pointing the gun in a way that was going to harm him. Officer Lomas thought it was "very unusual" for someone to drive with a gun in their hand and not have it "holstered or in the trunk or back seat."

By the time Officer Lomas arrived at Dexter's Pub, Madison Police Sgt. Brian Chaney already had arrived. Madison Police Officer Sarah Boespflug arrived next. The three officers planned to walk into the parking lot and look at the Jeep to see if a gun was visible inside. Before they could do so, however, Roric Gibbs walked out of Dexter's. Gibbs matched the physical description that Gruchow had provided to Officer Lomas: he was a younger white male with blonde hair, wearing khaki pants and a blue, collared shirt.

Sgt. Chaney instructed Gibbs to show his hands. Gibbs complied. Sgt. Chaney instructed Gibbs to turn around and put his hands on the building wall. Gibbs complied. Officer Lomas placed Gibbs in handcuffs for officer safety and the safety of anyone else in the area, and Sgt. Chaney frisked Gibbs for weapons.

Gibbs told the officers that he was the driver of the Jeep. Officer Lomas escorted Gibbs over to a squad car in the parking lot and placed him in the back. Officer Lomas then contacted Katherine Gruchow to get more identifying information and verify the sequence of events that she had reported. At that time, Katherine told Officer Lomas that she was disturbed. Officer Lomas read Gibbs his *Miranda* rights. Gibbs answered "yes" to the questions of whether he understood his rights and whether he wished to waive them. None of the officers treated Gibbs roughly during their interaction with him.

After waiving his *Miranda* rights, Gibbs told Officer Lomas that the items he had in the car were airsoft guns, which are replicas of real firearms manufactured to look like real guns, and that he worked as a referee for some type of airsoft group. An airsoft gun usually has the same color, dimensions, weight and markings as the firearm it emulates. On Sunday, July 15, 2012, Gibbs had been a referee for an organized game involving airsoft guns at Apocalypse Paintball in Poynette. After completing his duties at about 6:00 or 7:00 p.m., Gibbs hung around for awhile socializing before driving home to Madison. On his way home, a friend called and suggested that they meet for a beer at Dexter's Pub and Gibbs agreed.

Gibbs still had an airsoft gun in a holster on his right leg because he had forgotten to take it off when he got into his Jeep to drive back to Madison. During the drive, Gibbs got sick of the airsoft gun and holster being on his leg and decided to take it off while he was at a stoplight. After he removed the holster from his leg, Gibbs may have raised the gun up before placing it on the front passenger seat of his Jeep. Gibbs also handled the airsoft gun a second time before arriving at the pub. As he was driving along on the streets in Madison, Gibbs may well have pointed the gun upward at the ceiling of the Jeep Cherokee in an effort to see whether the

5

magazine had live ammunition in it. Gibbs acknowledges that holding up a gun in a moving vehicle could scare people.

The airsoft gun was in plain view on the floor of the passenger side of the Jeep.[4] After the police investigation was completed on July 15, 2012, Officer Lomas consulted with Sgt. Chaney and together they decided the appropriate resolution was to issue Gibbs a misdemeanor citation for disorderly conduct. Officer Lomas issued the citation, and Gibbs signed it. Gibbs understood that he was being given a misdemeanor citation for disorderly conduct.

Officer Lomas collected the airsoft gun and secured it as evidence in connection with the disorderly conduct investigation. Gibbs was released. The misdemeanor disorderly conduct charge later was dismissed on stipulation signed by Gibbs's attorney and the assistant district attorney for Dane County, with the order approved by the judge.

OPINION

**I. Summary Judgment Standard**

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'" *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)). In determining whether a genuine issue of material facts exists, the court must construe

---

[4] The parties dispute whether Gibbs consented to a search of the passenger side of his vehicle before the citation was issued. Officer Lomas recalls Gibbs giving consent, but Gibbs denies doing so.

all facts in favor of the nonmoving party. *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007). A party that bears the burden of proof on a particular issue may not rest on his pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires a trial. *Hunter v. Amin*, 538 F.3d 486, 489 (7th Cir. 2009) (internal quotation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). He must come forward with enough evidence on each of the elements of his claim to show that a reasonable jury could find in his favor. *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).

## II. Fourth Amendment

Gibbs alleges that Officer Lomas had no justification for arresting him, searching his car, citing him, and seizing his airsoft gun. Officer Lomas contends that she had probable cause to arrest Gibbs for disorderly conduct, *see* Wis. Stats. § 947.01, and that she was allowed to search his vehicle incident to that arrest. She further argues that even if she did not have a reasonable basis to arrest Gibbs and search his vehicle, the doctrine of qualified immunity shields her from liability in this case.

"Probable cause to arrest is an absolute defense to any claim against police officers under § 1983 for wrongful arrest, even where the defendant officers allegedly acted upon a malicious motive." *Tebbens v. Mushol*, 692 F.3d 807, 816 (7th Cir. 2012) (quoting *Wagner v. Washington County*, 493 F.3d 833, 836 (7th Cir. 2007)). Whether an officer has probable cause depends on what she saw and heard and the facts known to her at the time of arrest. *Id.*; *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *Carmichael v. Village of Palatine*, 605 F.3d 451, 457 (7th Cir. 2010).

The relevant inquiry is whether at the time of the arrest, the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). The analysis is objective; the subjective motivations of the officer cannot invalidate a seizure otherwise supported by probable cause. *Carmichael*, 605 F.3d at 457.

Whether an act constitutes an offense depends on state criminal law. *Jones v. Clark*, 630 F.3d 677, 684 (7th Cir. 2011), and officers may arrest a person for *any* conduct constituting a criminal offense, even a minor one. *Tebbens*, 692 F.3d at 818 (citing *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). The Court of Appeals for the Seventh Circuit has held that

> it is firmly established that the Fourth Amendment permits an officer to make an arrest when he or she has probable cause to believe that an individual has committed or is committing an act which constitutes an offense under state law, *regardless* of whether state law authorizes an arrest for that particular offense.

*Id.* (citing *Virginia v. Moore*, 553 U.S. 164, 176 (2008); *Thomas v. City of Peoria*, 580 F.3d 633, 638 (7th Cir. 2009)). In other words, it is not unconstitutional to arrest a person for committing an offense that is not punishable with jail time. *Atwater*, 532 U.S. at 351-54; *Thomas*, 580 F.3d at 637-38 (summarizing Supreme Court precedent holding that Fourth Amendment does not forbid arrest for "nonjailable" offenses like minor traffic and immigration violations).

With respect to searches, the U.S. Supreme Court has made clear that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Arizona v. Gant*, 556 U.S. 332, 351 (2009);

*see also United States v. Slone*, 636 F.3d 845, 851-52 (7th Cir. 2011) (explaining same). "When these justifications are absent, a search of an arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies." *Id.*

Here, Gibbs was cited for the misdemeanor offense of disorderly conduct. *See* Wis. Stats. § 947.01. As explained below, because Officer Lomas did not have even "arguable" probable cause to arrest Gibbs, the arrest and subsequent search of his car were unconstitutional and Officer Lomas is not entitled qualified immunity from civil liability.

### A. Disorderly Conduct

Effective November 2011, about eight months before Officer Lomas arrested Gibbs, the Wisconsin legislature passed the Personal Protection Act (2011 Wisconsin Act 35), more commonly known as the Concealed Carry Law (CCL). Among other things, the CCL amended Wisconsin's disorderly conduct statute to add a new subsection related to openly carrying a firearm. *See* Wis. Stat. § 947.01(2). The amended statute provides:

> (1) Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor.
>
> (2) Unless other facts and circumstances that indicate a criminal or malicious intent on the part of the person apply, a person is not in violation of, and may not be charged with a violation of, this section for loading, carrying, or going armed with a firearm, without regard to whether the firearm is loaded or is concealed or openly carried.

Pursuant to subsection (2), in order for the police to have probable cause to arrest Gibbs for disorderly conduct, they would have to be aware of facts or circumstances indicating that

Gibbs was acting with a criminal or malicious intent. Here, Officer Lomas based her arrest on Katherine Gruchow's reports to dispatch and to Officer Lomas that Gibbs was driving with a gun by his head and pointed at the roof of the car, was driving badly and "speeding really fast." Gruchow explained to Officer Lomas that she thought Gibbs was driving badly because he accelerated very quickly from a red light. However, both Gruchow and the dispatch officer told Officer Lomas that Gibbs was not acting in a threatening manner and was not pointing the gun at anyone. Gruchow later agreed in her deposition testimony that she did not consider the situation an emergency and she did not think that a crime had been committed.

Considered as a whole, these facts do not evidence any criminal or malicious intent on the part of Gibbs. Certainly if Gibbs had placed his hand on the trigger, or had pointed the gun at someone or something besides the roof of his own car, or had done anything at all that could reasonable be construed by an observer as any sort of attempt to hurt himself or to threaten others, then the answer might be different. But the facts known to Officer Lomas at the time she took Gibbs into custody would not lead a reasonable person to believe that Gibbs had violated the newly-amended disorderly conduct statute. Although seeing a person hold a gun in a car likely would alarm many people, and may well have been a rare sight before the passage of the CCL, the State of Wisconsin has specifically implemented a right to carry firearms openly and has explicitly exempted such behavior from prosecution.

Perhaps realizing this, Officer Lomas argues that Gibbs's conduct does not fit within subsection 2 of the statute because that section applies only to real firearms and not fake ones. She asserts that Gibbs's conduct is instead subject to the general rule in subsection 1 against otherwise disorderly conduct that tends to cause or provoke a disturbance. *See City of Oak Creek*

*v. King*, 148 Wis. 2d 532, 541, 436 N.W.2d 285 (Wis. 1989) (otherwise disorderly conduct is that having tendency to disrupt good order and cause or provoke a disturbance). Although this argument is creative and perhaps technically correct, it is a sophistical nonstarter.

If openly carrying a real firearm cannot be disorderly conduct, *a fortiori* openly carrying a fake firearm, without more, cannot be considered "otherwise disorderly." Gibbs's display of the airsoft gun—at least under the circumstances in this case—would only tend to disrupt good order or cause a disturbance because people might mistake it for a real firearm. The Gruchows were "disturbed" because they thought they saw a man holding a real gun; if they had known that the gun was fake, then there would have been no cause for alarm and Officer Lomas would not have arrested Gibbs for displaying it. The fact that the weapon turned out to be a replica is of no consequence.

Following defendant's logic, law enforcement would have probable cause to arrest anyone openly carrying a firearm—real or not—if they believed that the firearm was a fake. To the same effect, under Officer Lomas's exegesis of the statute, police could stop any motor vehicle in which a weapon resembling a firearm had been seen to determine if the weapon was a genuine firearm, or a replica, releasing uncharged the firearm owners but charging the replica owners with disorderly conduct. Since the initial stop constitutes a Fourth Amendment seizure, *see United States v. Bueno*, 703 F.3d 1053, 1059 (7th Cir. 2013) (*rev'd as to sentencing, Gonzalez-Zava v. United States,* 133 S.Ct. 2830 (2013)), this practice would create a new, unintended burden the constitutional rights of the firearm owners, effectively turning the new statute on its head.

In sum, I cannot find as a matter of law that Officer Lomas had probable cause to arrest Gibbs for violating the disorderly conduct statute. As a result, Officer Lomas's subsequent search of Gibb's car can not be justified as a search incident to arrest under *Gant*.

### III. Qualified Immunity

Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties. *Findlay v. Lendermon*, __ F.3d ___, 2013 WL 2992392, *2-3 (7th Cir. 2013). Claims of qualified immunity involve two inquiries: (1) whether the official violated a constitutional or statutory right, and (2) whether the right was clearly established at the time of the alleged misconduct. *Gonzales v. Village of West Milwaukee*, 671 F.3d 649, 657 (7th Cir. 2012) (citing *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010)). Even in this case where the answer to the first inquiry is yes, "the plaintiff bears the burden of defeating [the qualified immunity defense] either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d 706 at 723-24 (citing *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)).

To determine whether a right is clearly established, courts must look at the right in a "particularized" sense, rather than "at a high level of generality;" however, it is not necessary that the very action in question previously have been held unlawful. *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) (quoting *Safford Unified Sch. Dist. v. Redding,* 557 U.S. 364, 377 (2009); *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). The basic question is whether the state of the law at the time gave defendants reasonable notice that their actions violated the Constitution. *Id.* "[T]he

contours of the right [must be] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Findlay*, 2013 WL 2992392 at *3 (citing *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000)).

An individual's constitutional right to be free from arrest without probable cause is a clearly established right. *Fleming*, 674 F.3d at 879-80 (citing *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998); *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). Also clearly established is the doctrine of qualified immunity for police officers in false arrest cases. *Fleming*, 674 F.3d at 880. "Qualified immunity protects officers who are 'reasonable, even if mistaken' in making probable cause assessments." *Tebbens*, 692 F.3d at 820 (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). The court of appeals has referred to this standard as "arguable probable cause," which is established:

> when 'a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law.'

*Fleming*, 674 F.3d at 880 (quoting *Humphrey*, 148 F.3d at 725).

Gibbs acknowledges that there is no closely analogous case because the amendment to the disorderly conduct statute was so new at the time of his arrest. He maintains, however, that even though the contours of the recently-amended disorderly conduct statute had not been tested under facts similar to those in his case, Officer Lomas should have been on notice that she could not arrest a person for holding up a gun in his car without any other evidence of criminal or malicious intent. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.").

13

Prior to the enactment of CCL, it was not clear whether openly carrying a firearm constituted disorderly conduct. *See Gonzales*, 671 F.3d at 655-56. As indicated above, without the constitutional right to bear arms in the mix, an individual holding a firearm near his head in a vehicle, under the right circumstances, might have created the type of public unease and agitation ordinarily sufficient to establish probable cause to arrest for disorderly conduct under the old Wisconsin law. *See id.* (offering same observation where plaintiff entered a Menards store wearing a leather trenchcoat in mid-May with a gun visible in a thigh holster and entered a Wal-mart store carrying a gun by his side late in the evening when employees were collecting money from registers).

However, even prior to the amendment to the disorderly conduct statute, the Wisconsin Attorney General had issued an informal Advisory Memorandum, entitled "The Interplay Between Article I, § 25 Of The Wisconsin Constitution, The Open Carry of Firearms And Wisconsin's Disorderly Conduct Statute, Wis. Stat. § 947.01," instructing that "the mere open carrying of a firearm by a person, absent additional facts and circumstances, should not result in a disorderly conduct charge from a prosecutor." *See Gonzales*, 671 F.3d at 658 (citing memorandum and noting "[t]hough not a formal Attorney General's opinion, the Advisory was directed to Wisconsin's district attorneys and intended for the education of front-line prosecutors and law-enforcement officers within their jurisdictions"). To illustrate its point, the opinion provided two examples: "[A] hunter openly carrying a rifle or shotgun on his property during hunting season while quietly tracking game should not face a disorderly conduct charge," but "if the same hunter carries the same rifle or shotgun through a crowded street while barking at a passerby, the conduct may lose its constitutional protection." *Id.*

Any uncertainty regarding the matter, however, was resolved by the CCL's addition of subsection (2). *Id.* at 659 ("Until the 2011 amendment to section 947.01, the legal landscape was uncharted" with respect to the right to openly carry a firearm). Therefore, by the time that Gibbs was arrested in mid-2012, Wisconsin law regarding open carry no longer was in flux. *Cf. Gonzalez*, 671 F.3d at 559-60 (officer entitled to qualified immunity because open carry rights were in flux; state supreme court was considering meaning and application of Second Amendment at the time); *Burgess v. Wallingford*, 2013 WL 4494481, *5 (D. Conn. May 15, 2013) (although Connecticut statute did not explicitly prohibit permit holder from openly carrying a pistol, courts had found that individuals could be subject to arrest for violating several other statutes, making state of law with respect to open carry unsettled). Indeed, the *Gonzalez* case was five months old at the time of Gibbs's arrest; while this court doesn't expect patrol officers to be reading slip opinions or checking Westlaw for legal updates, it would expect the Madison Police Department to have provided clearer guidance to its officers on this sea change in the law that was so critical to how patrol officers responded to reports of firearms in the community. There had to be additional facts and circumstances showing criminal or malicious intent.

Given the legal landscape at the time and the facts known to Officer Lomas, it would have been apparent to a reasonable officer that Officer Lomas had no reasonable basis for arresting Gibbs.[5] Officer Lomas could not have mistaken Gibbs's conduct for threatening behavior or a malicious intent. *Accord Catlin v. City of Wheaton*, 574 F.3d 361, 369 (7th Cir.

---

[5] Also indicative of the state of the law was the passage of Wis. Stat. § 167.31, effective April 2012, which specifically allows a person to possess, transport and even load a handgun in a vehicle.

2009) ("[W]hile the substantive constitutional standard protects officers' reasonable factual mistakes, qualified immunity protects them from liability where they reasonably misjudge the legal standard."). As a result, Officer Lomas is not entitled to qualified immunity.

Several other points, although tangential, merit at least brief mention. As the facts make clear, Officer Lomas did not act precipitously in arresting Gibbs; she consulted with Sgt. Chaney, and they mutually decided that a disorderly conduct charge was appropriate. Sgt. Chaney was just as incorrect about this as Officer Lomas was. There is no indication in the record that their intent was to mollify the Gruchows, but even if it were, as the court observed in *Gonzalez,* Wisconsin's disorderly conduct statute has never applied to conduct that offends the hypersensitive, and when the Second Amendment is factored into the mix, along with the eight-month old statutory exemption for firearms, one would have expected well-trained officers to have reached a different conclusion about whether to charge Gibbs with a misdemeanor.

This segues to another point: the Fourth Amendment also allows law enforcement officers to ensure their own safety when investigating criminal activity, particularly when they have reason to suspect that firearms may be present. *See, e.g., United States v. Howard*, ___ F.3d ___, 2013 WL 4615255 at *3 (7th Cir., Aug. 30 2013) (handcuffing and frisking a person who is not even suspected of criminal activity might be acceptable in limited circumstances so long as the intrusion on individual liberty is marginal and is outweighed by the government interest in conducting legitimate police activities safely and free from interference.) The officers in the parking lot of Dexter's on July 15, 2012, were legitimately concerned for their own safety and the safety of bystanders in light of the report that a man in the bar had been seen driving about with a handgun displayed. But in light of Wisconsin's new CCL, what were their viable safety

options? It is pointless to speculate as to where the line might have been in this case because the police did not stop short of arresting Gibbs and charging him with a crime for conduct that clearly did not fit within the disorderly conduct statute.

## IV. Conclusion

Given that all of the relevant facts regarding the arrest of Gibbs and the subsequent search of his car appear to be undisputed, it is unclear what is left for trial on the issue of liability. *See Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 714 (7th Cir. 2013) (internal citations omitted) (where "underlying facts [regarding the arrest] are undisputed, the court can make that decision on summary judgment"). As a result, I will give the parties until September 20, 2013 to show cause why I should not enter summary judgment in favor of Gibbs on liability and proceed to trial only on the issue of damages.

## ORDER

IT IS ORDERED that the motion for summary judgment, dkt. 8, filed by defendant Brooke Lomas is DENIED. Both sides may have until noon on September 20 2013 to report what issues, if any, remain to be tried the issue of liability. The parties' submission deadline in anticipation of the final pretrial conference is pushed back a week to September 27, 2103, with responses due by Thursday, October 10, 2013.

Entered this 16th day of September, 2013.

BY THE COURT:

/

STEPHEN L. CROCKER
Magistrate Judge